## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RONALD BANKS,** | : | **CIVIL NO. 3:CV-10-1480** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **SUPERINTENDENT JEFFREY A.** | : | |
| **BEARD, et al.,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Plaintiff Ronald Banks ("Banks"), a Pennsylvania state inmate who, at all times relevant, was housed at the State Correctional Institution at Retreat ("SCI-Retreat"), Hunlock Creek, Pennsylvania, commenced this civil rights action on July 19, 2010. (Doc. 1.) The matter is presently proceeding *via* an amended complaint filed on July 14, 2011, wherein Banks alleges that while incarcerated in the Secure Special Needs Unit (SSNU) at SCI-Retreat, restrictions placed on his religious practices violated his First and Fourteenth Amendment Constitutional rights. (Doc. 37). Named as defendants are Secretary Jeffrey A. Beard ("Beard"), Reverend Ulrich Klemm ("Klemm"), Superintendent James J. McGrady ("McGrady"), Deputy Superintendent Michael K. Hoover ("Hoover") and Facility Chaplaincy Program Director Reverend John Ritchey ("Ritchey"). Before the court is a motion for summary judgment pursuant to Federal Rules of Civil Procedure 56, filed on behalf of all defendants. (Doc. 85.) For the reasons set forth below, the motion will be granted and judgment will be entered in favor of defendants and against Banks.

## I.    <u>Summary Judgment Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  "'The non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial.'  <u>Celotex [ ]</u>, 477 U.S. [ ] 324 [ ] (1986) (internal quotations omitted)." <u>Schiazza v. Zoning Hearing Bd., Fairview Twp., York County, Pa</u>, 168 F. Supp. 2d 361, 365 (M.D. Pa. 2001).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## II.    <u>Statement of Material Facts</u>

Ramadan is the ninth month of the Islamic calendar.  (Doc. 103, at ¶ 1; Doc. 128, at ¶ 1.)  The Islamic faith has five main pillars, one of which is to fast during the month of Ramadan.  (<u>Id.</u> at ¶ 2; <u>Id.</u> at ¶ 2.)  Observing Ramadan is mandatory for all healthy adult

2

Muslims.  (Id. at ¶ 3; Id. at ¶ 3.)  The Pennsylvania Department of Corrections ("DOC") provides the opportunity for all healthy adult Muslims to observe Ramadan.  (Id. at ¶ 4; Id. at ¶ 4.)  Islamic inmates housed in the Restricted Housing Unit ("RHU") or other Level 5 Housing units, such as the SSNU, can observe and fast during Ramadan.  (Id. at ¶¶ 5-6; Id. at ¶¶ 5-6.)  All inmates participating in Ramadan in the RHU are accommodated with being served their evening meal after sunset and with a sahur bag, the contents of which are to be consumed before sunrise, and are free to break their daily fast with water, as is religiously permitted and acceptable.  (Id. at ¶¶ 7-8; Id. at ¶¶ 7-8.)

## A. Feasts of Eid al-Fitr and Eid al-Adha

The "Festivals & Celebrations in Islam" pamphlet submitted by Banks states that "the major part of the celebration [of the Feasts of Eid al-Fitr and Eid al-Adha] is not eating or drinking – rather it is a prayer that brings the Muslims together to remember Allah's favors and celebrate His glory and greatness." (Doc. 129-19, at 4.)  "These are very different from the celebrations in other nations and cultures." (Id.)  Each festival marks the conclusion of a major act of worship, reflects determination to continue in obedience and submission to Allah, and is an occasion for increasing in good deeds.  (Id.)

On Eid al-Fitr, which is celebrated on the first day of Shawwal, at the completion of Ramadan, Muslims show their joy for their health, strength and the opportunities of life which Allah has given to them to fulfill their obligation of fasting and other good deeds during the blessed month of Ramadan.  (Doc. 103, ¶¶ 9-10; Doc. 128, ¶¶ 9-10.)  The Muslim religion does not require participation in a feast or meal on Eid al-Fitr.  (Doc. 103, ¶ 11.)

3

"[T]he major part of the celebration is not eating or drinking – rather it is a prayer that brings the Muslims together to remember Allah's favors and celebrate His glory and greatness." (Doc. 129-19, at 4.) However, it is suggested that breakfast is eaten prior to prayer. (Doc. 129-27, at 1.)

Eid al-Adha is an Islamic festival to commemorate the willingness of Abraham to follow Allah's command to sacrifice his son. (Doc. 103, ¶ 12; Doc. 128, ¶ 12.) The Muslim religion does not require participation in a feast or meal on Eid al-Adha. (Doc. 103, ¶ 13.) Inasmuch as the feast involves the reward of the sacrifice or slaughter of an animal, the additional rewards may be attained by eating the meat, feeding family, sharing with friends and relatives, and giving some of it to charity. (Doc. 129-19, at 20.)

    1.   <u>DOC Policies</u>

Because the Commonwealth of Pennsylvania is responsible for providing three nutritionally balanced meals per day to all inmates, all inmates are provided the meals without cost. (Doc. 103, ¶ 26.) On the nationally-recognized holidays of Memorial Day, Independence Day, Labor Day, Thanksgiving, Christmas and New Year's Day, standard holiday menus are served at all state correctional institutions to all inmates at no cost to them. (Doc. 103, ¶¶ 46-47, 49; Doc. 128, ¶ 46.) There are no optional menu items available to be purchased on any of these holidays. (<u>Id.</u> at ¶ 50.) There is no standard holiday menu for Easter. (<u>Id.</u> at ¶ 48.)

The DOC has a policy applicable to all religious feasts, including Eid al-Fitr and Eid al-Adha. (Doc. 103, ¶ 14.) The policy provides that all menu items must be approved by the

4

Food Service Manager of the facility and be purchased by the facility. (Id. at ¶ 15.) The menu items must be reviewed and approved by the DOC's registered dietician to verify that they meet or exceed the dietary allowances as stated in the Recommended Dietary Allowances, Food and Nutrition of the National Academy of Sciences. (Doc. 128, ¶ 15; Doc. 129-41, at 3.) Preparation of food items is the responsibility of the Food Service Manager and his/her staff. (Doc. 103, ¶ 16.) In addition, the policy provides that if the food items are those on the scheduled menu, inmates do not have to pay for their food to celebrate the feast; however, if the feast includes food items beyond those provided on the menu, the inmate participant is required to assume the cost. (Id. at ¶ 17.) While the Commonwealth is required to provide three nutritionally balanced meals per day to all inmates, the DOC's policy on optional menu items for feasts provides that inmates who wish to partake in an optional meal for a feast to honor a particular holy day, are responsible for purchasing the optional items. (Id., at ¶¶ 26-27.) An inmate who desires to participate in a feast that will have menu items not from the regular institutional menu is required to submit a DC-138A, Cash Slip, two months prior to the event to ensure that he has the necessary funds in his inmate account to pay for the menu items. (Id. at ¶ 18.)

In the case of feasts such as Eid al-Fitr and Eid al-Adha, the Islamic chaplain at the institution determines which Muslim inmates are observant and have sufficient funds on account to participate in the feast. (Doc. 103, ¶ 19.) The cost for participating in the feast is divided equally among inmates so that each participating inmate pays the same fee. (Id. at ¶ 20.) If the community decides to purchase optional food items, inmates with sufficient funds

in their inmate accounts are permitted to participate.  (Id. at ¶ 23.)  The Muslim community

must agree on the same optional items for the feast; inmates may not order food items

individually.  (Id. at ¶ 22; Doc. 128, ¶ 22.)  As the feasts approach, staff and inmates are

advised of the approved optional menu items.  (Id. at ¶ 21; Doc. 128, ¶ 21.)  Inmates housed

in the RHU, or any other Level 5 housing unit, such as the SSNU, who are observant inmates

may participate by either a regular institutional menu tray or, if they have sufficient funds on

account, by partaking in the previously agreed upon optional items. (Id. at ¶¶ 24-25.)  A

number of inmate religious communities opt to forego the purchase of optional food items so

that inmates who lack funds nonetheless may participate.  (Id. at ¶ 28.)  At those institutions

where the inmate religious community agrees to purchase optional food items, inmates who

do not have funds may attend any services associated with the holy day.  (Id. at ¶ 30.)

However, for the feast associated with the holy day, these inmates are served the regular

menu items served to the general inmate population and are not permitted to gather with

other inmates to eat the optional food items which their religious community has elected to

purchase.  (Id. at ¶¶ 31, 33.)  There is no religious group activity or prayers at the feasts

which are missed by non-paying inmates.  (Id. at ¶ 32.)

Pursuant to DOC Policy 3.1.1., Fiscal Administration, effective January 27, 2009,

funds from the Inmate General Welfare Fund ("I.G.W.F.") may only be expended on

approved categories of items, none of which are permitted to relate to a specific religious

group.  (Doc. 103, ¶ 34 citing DOC Policy 3.1.1(IV)(K)(8); Doc. 101-2.)  Banks disputes this

in that in the 2009-10 I.G.W.F. Budget, there were expenditures in excess of $4000,

identified as "Christmas Expense," "PA State Holiday Kit, Standard," and "PA State Holiday Kit, diabetic." (Doc. 128, ¶ 33; Docs. 129-54, 129-55.)

Additionally, according to defendant Klemm, the Religion, Volunteer and Recreational Services Program Administrator responsible for the overall administration of the chaplaincy and volunteer programs in the 27 state correctional institutions in Pennsylvania, it is the policy of the DOC that one inmate may not purchase any item for another inmate due to security concerns. (Doc. 103 ¶ 25; Doc. 101-2, ¶¶ 1, 3.) The concerns are that an inmate who purchases or obtains items for another inmate may coerce that inmate to perform illicit or illegal acts on his behalf, blackmail, or otherwise jeopardize the security of the institution. (Doc. 103, ¶ 36.)

### 2. Feasts at SCI-Retreat

A standard Eid feast menu is served at all state correctional institutions on the Muslim feast days of Eid al-Fitr and Eid al-Adha. (Doc. 103, ¶ 37.) As the facility chaplain program director at SCI-Retreat, defendant Reverend Ritchey is responsible for determining which Muslim inmates who observe Ramadan and have sufficient funds are permitted to participate in the feast days of Eid al-Fitr and Eid al-Adha. (Id. at ¶ 51.) In 2008, Inmate Arturo Brown (Mr. Brown"), HC-8940, declares that he was permitted to participate in the feast of Eid al-Adha although he had insufficient funds because he received a personal gift from Lauren Wiles in the amount of $20.00 three days after the funds were withdrawn for the feast, which brought his account back to a positive balance. (Id. at ¶¶ 52-53; .) Inmate Gerald Dixon ("Mr. Dixon"), HA-8416, claims that he received funds from Inmate Eric Gilliam ("Mr.

Gilliam"), FL-1058, in 2007, to attend either Eid al-Fitr or Eid al-Adha. (Id. at ¶ 54.)

Defendant Ritchey reviewed the inmate account histories of Mr. Dixon and Mr Gilliam and

determined that Mr. Dixon did not receive funds from Mr. Gilliam to attend either Eid al-Fitr

or Eid al-Adha in 2007. (Id. at ¶ 55.) Inmate Ravanna Spencer ("Mr. Spencer"), FH-6976,

claims that he was permitted to be "put in the red" in his inmate account in 2006, in order to

attend the Eids feasts. (Id. at ¶ 56.) Defendant Ritchey reviewed Mr. Spencer's Inmate

Account history which revealed that he had sufficient funds in his account and he was not

"put in the red" for the Eid feasts in 2006. (Id. at ¶ 57.)[1]

The feasts menu for 2009, available to all Muslim inmates at no cost, included fish

fillet, vegetable patty, rice, lettuce, tomatoes, onions, salad dressing (Mayo type), mustard,

one steamed vegetable, bread and margarine, carrot cake, coffee, milk, sugar and water.

(Doc. 103, ¶¶ 38-40; Doc. 101-3, at 12.) Also available for purchase by participating inmates

were a number of optional menu items to be selected and agreed upon by the respective

Muslim community at each institution. (Id.) In 2009, the Muslim community at SCI-Retreat

chose to participate in purchasing optional menu items. (Doc. 103, ¶ 43.) All inmates,

including inmates housed in the Restricted Housing Unit ("RHU") or any other Level 5

---

[1]Banks takes issue with the fact that the inmate account history statements of other
inmates were not submitted in support of defendant Ritchey's statements. In light of the fact
that inmate account statements are confidential, and given that defendant Ritchey has
provided the information to the Court under penalty of perjury in accordance with 28 U.S.C.
§ 1746, the Court is satisfied that the statements provided by defendant Ritchey are true and
correct based on his personal knowledge and review of records and will not require in camera
review.

housing unit, who had funds, could purchase the optional menu items. (Id. at ¶ 41.)

In 2009, Ronald Banks was an indigent inmate who was housed in the RHU and SSNU at SCI-Retreat. (Doc. 103, ¶ 42; Doc. 128, ¶ 42.) Because he was indigent, he was not eligible to participate in the feasts of optional menu items that were purchased by the Muslim community. (Doc. 103, ¶ 43.) Banks concedes that he was indigent and did not receive the optional menu items in 2009, but disputes that he received the feast meals on September 24, 2009, and December 2, 2009, of fish fillet, vegetable patty, rice, lettuce, tomatoes, onions, salad dressing (Mayo type), mustard, one steamed vegetable, bread and margarine, carrot cake, coffee, milk, sugar and water. (Doc. 128, ¶¶ 37-38.)

In 2010, the Muslim community at SCI-Retreat elected not to purchase the optional menu so that all eligible Muslim inmates, including those who were indigent, could celebrate the feasts of Eid al-Fitr and Eid al-Adha together. (Doc. 103, ¶ 44.) Because the Muslim community elected not to purchase the optional menu items and he was housed in a Security Level 3 Unit in 2010, Ronald Banks was eligible to attend and celebrate the feasts with fellow Muslim inmates. (Id. at ¶ 45.)

**B.      Use of Prayer Oils during Religious Services**

Islam highly encourages Muslims to be clean at all times; it is a religion of cleanliness. (Doc. 103, ¶ 58; Doc. 128, ¶ 58.) Islam recommends Muslim men to use a nice scented oil or perfume before Eid prayers, particularly before Friday Jumu'ah prayer. (Doc. 103, ¶ 59 .) The use of scented oil/perfume is a recommended practice of Prophet Muhammad, however, it is entirely optional and it is not mandatory. (Id. at ¶ 60; Doc. 129-

24, at 2; Doc. 129-25, at 2; Doc. 129-26.) The use of incense and prayer oils in Islamic religious ceremonies has been prohibited at SCI-Retreat for approximately ten years. (Doc. 103, ¶ 61; Doc. 128, ¶ 61; Doc. 129-67, at 2.) Prior to the prohibition of the prayer oils, they were stored in defendant Ritchey's office in a locked cabinet and used only during ceremonies. (Doc. 103, ¶ 62.) Despite the precautions taken to keep the prayer oils in a safe location, inmates broke into defendant Ritchey's locked office and stole the prayer oils from the locked cabinet on multiple occasions. (Id. at ¶ 63.) The inmates who stole the prayer oils would then sell it to other inmates or use it to manipulate other inmates. (Id. at ¶ 64.) Additionally, because the prayer oils are scented, they could be used to mask the scent of other contraband. (Id. at ¶ 65.) Defendant Ritchey was directed by a deputy superintendent to discontinue the use of prayer oils at SCI-Retreat. (Id. at ¶ 66.) The decision to discontinue the prayer oils was necessary in order to deter the thefts and subsequent activities of the inmates who stole the oil. (Id. at ¶ 67.) Whether prayer oil is distributed to Muslim inmates attending Jum'ah and the manner of distribution varies from institution to institution throughout the DOC. (Doc. 129-67.)

### C. Requests for Religious Accommodation

The DOC policy for religious activities is set forth in Department of Corrections Administrative Directive 819 ("DC-ADM 819"). (Doc. 103, ¶ 69; Doc. 128, ¶ 68; Doc. 101-2, at 17-30; Doc. 129-53.) The DOC is committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services, while guarding against the misuse of inmates claiming religious beliefs as a means of obtaining

special privileges or breaching security. (Doc. 103, ¶ 69.) Worships services for major faith groups, which represent the whole body of a particular faith group, such as Catholics, Jehovah's Witnesses, Jewish, Muslim, Native American and Protestants are provided in all correctional institutions unless there is a temporary vacancy. (Doc. 103, ¶¶ 70- 71; Doc. 128, ¶ 71.) Religious leaders, including but not limited to chaplains, imams and rabbis are approved by the DOC in order to assure that worship is in accordance with the tenets of the faith groups and to guard against potential security concerns. (Doc. 103, ¶ 72.) The DOC allows for diversity of worship, and reasonable accommodation are made for inmates consistent with the order, safety and security of the correctional facility, prison staff and inmates, including faith groups that fall outside of the majority groups. (Doc. 103, ¶ 73.)

Inmates seeking accommodations for a particular faith are directed to express their concerns to the Religious Accommodation Review Committee (RARC) *via* an Inmate Religious Accommodation Request Form ("RAR"). (Doc. 103, ¶ 74.) In accordance with DC-819, inmates must first submit an RAR to the Facility Chaplain Program Director ("FCPD"). (Doc. 103, ¶ 75; Doc. 128, ¶ 75.) The evaluation of all RARs is the same, no matter to what religious group the inmate belongs. (Doc. 103, ¶ 76.) The inmate is encouraged to obtain written information from his outside faith group, including any publications that describe the goals, beliefs and practices of the group and supply this information to the FCPD for review. (Id. at ¶ 77.) Staff at the institution also evaluates the RAR and, upon completion of the institutions evaluation of a request, the request is forwarded to the RARC. (Id. at ¶ 78.) The RARC then reviews the request and makes a

recommendation to the Regional Deputy Secretary.  (Id. at ¶ 78.)  Upon completion of review, the RARC notifies the Facility Manager and the FCPD, who then notifies the inmate of the outcome of the request.  (Id. at ¶¶ 80-81; Doc. 128,¶¶80-81.)  If an inmate is informed that the request will not be accommodated, he may file a grievance in accordance with the DOC's Grievances policy, DC-ADM 804.  (Id. at ¶ 82; Id. at ¶ 82.)

In April 2009, Banks submitted an RAR, that was acknowledged by FCPD defendant Ritchey, requesting that the I.G.W.F. pay the cost for indigent inmates to attend the Eid feasts, that other inmates be allowed to pay the costs for those who do not have the funds to participate, or that indigent inmates be advanced the costs by the Commonwealth by going further into debt in their inmate accounts.  (Doc. 103, ¶¶ 83-84; Doc. 128, ¶¶ 83-84.)  Staff at SCI-Retreat reviewed and disapproved the request of Banks because they felt that he had "placed himself in the position to not be able to pay for the feasts."  (Doc. 103, ¶¶ 85-86.)  After review, the RARC denied the request, stating that outside organizations could donate the costs of the feasts or offset the costs incurred by inmates, and Muslim communities who desire additional food for the Eid feast observances must do so at their own costs.  (Id. at ¶¶ 87-88.)  His RAR was then reviewed by Acting Deputy Frank Tennis who upheld the decision of the RARC.  (Id. at ¶ 89.)

## III.     Discussion

### A.     Religious Land Use and Institutionalized Persons Act of 2000

Section 3 of Religious Land Use and Institutionalized Persons Act of 2000  ("RLUIPA") provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious

exercise of a person residing in or confined to an institution . . . even if the burden results from a rule

of general applicability," unless the government establishes that the burden furthers "a compelling

interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA

defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or

central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); see also Cutter v. Wilkinson,

544 U.S. 709, 715 (2005).

Although Congress intended that RLUIPA be construed "in favor of broad protection of

religious exercise," see 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply

the Act's standard with 'due deference to the experience and expertise of prison and jail

administrators in establishing necessary regulations and procedures to maintain good order, security

and discipline, consistent with consideration of costs and limited resources.'" Cutter, 544 U.S. at

723. Congress indicated that in the event an inmate's request for religious accommodation would

"become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the

effective functioning of an institution, the facility would be free to resist the imposition." Id. at 726.

Under RLUIPA, the plaintiff must show that his religious exercise has been burdened

substantially by the challenged conduct. Washington v. Klem, 497 F.3d 272, 277-78 (3d Cir. 2007).

The Third Circuit Court of Appeals has found that for the purposes of RLUIPA, a substantial burden

exists where: "1) a follower is forced to choose between following the precepts of his religion and

forfeiting benefits otherwise generally available to other inmates versus abandoning one of the

precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure

on an adherent to substantially modify his behavior and to violate his beliefs." Id. at 280. If the

plaintiff shows that prison administrators' action or inaction has imposed a substantial burden on the

exercise of his religion, the prison administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest. Id. at 283.

Although defendants address the merits of the RLUIPA claim in their brief in support of their motion for summary judgment (Doc. 102), in their reply brief, they seek judgment on various other grounds. (Doc. 130.) They first contend that Banks cannot recover compensatory or punitive damages against defendants in either their individual or official capacities under RLUIPA. (Doc. 130, at 3.) The Court agrees. In 2012, in the matter of Sharp v. Johnson, 669 F.3d 144 (3d Cir. 2012), in considering this very issue, the United States Court of Appeals for the Third Circuit stated that "the Courts of Appeals for the Fourth, Fifth, Seventh and Eleventh Circuits—the only circuits we are aware of that have addressed this issue in precedential opinions—have rejected arguments similar to Sharp's and held that RLUIPA does not permit actions against government employees in their individual capacities. See, e.g., Nelson v. Miller, 570 F.3d 868, 886–89 (7th Cir. 2009); Rendelman v. Rouse, 569 F.3d 182, 186–89 (4th Cir. 2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 327–29 (5th Cir.2009); Smith v. Allen, 502 F.3d 1255, 1271–75 (11th Cir. 2007), abrogated on other grounds, Sossamon v. Texas, ⸺ U.S. ⸺, 131 S.Ct. 1651, 1654, 179 L.Ed.2d 700 (2011) (abrogating Smith as to the claim against government employees in their official capacities)." Sharp, 669 F.3d at 153-54. The Third Circuit joined those circuits in concluding that RLUIPA does not permit an action against defendants in their individual capacities. Id. at 155.

Defendants also argue that Banks cannot recover damages against the defendants in their official capacities as they are barred by the Eleventh Amendment. (Doc. 13, at 3.) The Eleventh Amendment bars money damages sought against a state official acting in his or her

official capacity absent a valid abrogation by Congress or consent of the State. <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985) (holding that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court."). Congress did not validly abrogate or purport to abrogate the States' sovereign immunity against damages claims under RLUIPA, and the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. <u>Scott v. Beard</u>, 2007 WL 3194039, at *1 (3d Cir. 2007) (finding that the RLUIPA claim for money damages against a Pennsylvania state official in his official capacity is barred by the Eleventh Amendment because it is essentially a claim against the state itself.) Defendants are entitled to summary judgment on the RLUIPA claim lodged against defendants in their official capacities.

To the extent that Banks seeks injunctive and declaratory relief on his RLUIPA claims, defendants contend that such claims are moot based on the transfer of Banks from SCI-Retreat to SCI-Somerset. An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims. <u>Abdul-Akbar v. Watson</u>, 4 F.3d 195, 197 (3d Cir. 1993) (finding that former inmate's claim that the prison library's legal resources were constitutionally inadequate was moot; plaintiff was released five months before trial, because "past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding equitable relief if unaccompanied by continuing, present adverse effects." <u>Rosenberg v. Meese</u>, 622 F. Supp. 1451, 1462 (S.D.N.Y. 1985). Furthermore, "[a]bsent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred." <u>Wahl v. McIver</u>,

773 F.2d 1169, 1173 (11th Cir. 1985) (citation omitted); <u>see</u> <u>also</u>, <u>Carter v. Thompson</u>, 808 F. Supp. 1548, 1555 (M.D. Fla. 1992); <u>see</u> <u>also</u>, <u>Pruden v. Schuylkill Cnty Prison Med. Staff</u>, Civil No. 3:CV-07-006, 2007 WL 465522 *1 (M.D. Pa. Feb. 6, 2007). The RLUIPA claims for equitable and declaratory relief were rendered moot upon Banks's transfer from SCI-Retreat. Consequently, defendants are entitled to an entry of summary judgment.

Notably, even if Banks were able to overcome each of these obstacles, he would still not be entitled to relief. With respect to the Feasts of Eid al-Fitr and Eid al-Adha, it is clear from the record that the Muslim religion does not compel participation in a feast or meal on either feast day. And, it is undisputed that Muslim inmates can fully practice their religion without attending because no religious group activities or prayers take place during the feasts. As concerns the use of prayer oils, the record demonstrates that the use of such oils is optional. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989). Banks has failed to meet this burden in that he has failed to create a genuine issue of fact as to whether the inability of indigent inmates to participate in the purchase of optional menu items for the feasts and attend the feasts, and the lack of access to prayer oils, substantially burdened the exercise of his religion.

**B.      First Amendment Exercise of Religion**

The First Amendment offers protection for a wide variety of expressive activities. <u>See</u>

U.S. CONST. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Although prisoners must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment, Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion.  O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987).  It is well-established that only those beliefs which are (1) sincerely held, and (2) religious in nature are entitled to constitutional protection.  Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981) (describing three indicia of religion (1) an attempt to address "fundamental and ultimate questions" involving "deep and imponderable matters"; (2) a comprehensive belief system; and (3) the presence of formal and external signs like clergy and observance of holidays.).  It is undisputed that Banks's sincerely held religious beliefs are entitled to Constitutional protection.

       1.     Turner Analysis

Whether an inmate's free exercise of religion has been impermissibly burdened is governed by the four-part test set forth by the Supreme Court in Turner, 482 U.S. 78.  Specifically, Turner instructs courts to weigh four factors when applying this standard:  (1) whether the regulation or practice bears a "valid, rational connection" to a legitimate and neutral governmental objective; (2) whether prisoners have alternative ways of exercising the

17

circumscribed right; (3) whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and (4) whether alternatives exist that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. Id. at 89-91.

The first factor requires consideration of whether the restrictions on the plaintiff's religious rights bear a valid and rational connection to a legitimate and neutral objective. Under this prong, courts accord great deference to the judgment of prison officials, who are charged with the "formidable task" of running a prison. Sutton v. Rasheed, 323 F.3d 236, 253 (3d Cir.2003) (quoting O'Lone, 482 U.S. at 353). The first factor is "foremost" in the Court's analysis, in that a rational connection is a "threshold requirement." Id. (quoting Wolf v. Ashcroft, 297 F.3d 305, 310 (3d Cir. 2002)). The second factor requires consideration of whether inmates have alternative means of exercising the constitutional right at issue. In the free exercise context, the Court considers whether the inmate has other means of practicing his religion generally, not whether he has other means of engaging in any particular practice. Sutton, 323 F.3d at 255 (quoting DeHart, 227 F.3d at 55). The third and fourth Turner factors focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources. Sutton, 323 F.3d at 257 (quoting DeHart, 227 F.3d at 57).

> a. *Feasts of Eid al-Fitr and Eid al-Adha*

Defendants argue that Banks's sincerely held religious beliefs were not substantially burdened because the feasts are not required by the Islamic religion and his inability to

participate in 2009, when he was indigent and the Muslim community at SCI-Retreat chose to purchase optional menu items, did not prevent him from practicing his faith. Defendants also contend that the DOC provides three balanced meals to all inmates, as required, and that "cost containment, *i.e.*, not diverting limited resources to satisfy one limited group's food preferences, is clearly a legitimate penological objective." (Doc. 102, at 22.) Banks argues that in 2009 this policy impermissibly restricted his religious rights as an indigent Muslim inmates because he was unable to purchase optional menu items, and thus, unable to gather with other inmates to eat the optional food items which their religious community had elected to purchase.[2]

Because the Commonwealth of Pennsylvania is responsible for providing three nutritionally balanced meals per day to all inmates, all meals are provided without cost. (Doc. 103, ¶ 26.) On the nationally-recognized holidays of Memorial Day, Independence Day, Labor Day, Thanksgiving, Christmas and New Year's Day, standard holiday menus are served at all state correctional institutions to all inmates at no cost to them.[3] (Id. at ¶¶ 46-47, 49; Doc. 128, ¶ 46.) There are no optional menu items for purchase on any of these holidays. (Id. at ¶ 50.) The policy applicable to all religious feasts, including Eid al-Fitr and Eid al-Adha provides that all menu items must be approved by the Food Service Manager of the facility and be purchased by the facility. (Doc. 103, ¶¶ 14-15.) If the food items are those on

---

[2]The Muslim community at SCI-Retreat did not purchase optional menu items in 2010.

[3]Despite Banks's contention to the contrary, there is no standard holiday menu for Easter. (Doc. 103, ¶ 48.)

the scheduled menu, inmates do not have to pay for their food to celebrate the feast; however, if the feast includes food items beyond those provided on the menu, the inmate participant is required to assume the cost.  (Id. at ¶ 17.)

It is clear that the policy of requiring inmates to purchase optional menu items for religious feasts has a valid rational connection to the legitimate government purpose of cost containment.  Significantly, it has been held that the First Amendment, while protecting the right of individuals to engage in the practice of their religion, does not require the government to subsidize that right.  Riley v. Beard, No. 08-1675, 2011 WL 1204264, *23 (W.D. Pa. March 29, 2011) (relying on Freedom of Religion Found, Inc. v. McCallum, 179 F. Supp.2d 950, 981 (W.D. Wis. 2002) citing Regan v. Taxation with Representation of Washington, 461 U.S. 540, 546 (1983)).

Under the second factor there is no doubt that Banks had other means of practicing his religion generally.  Sutton, 323 F.3d at 255 (quoting DeHart, 227 F.3d at 55).  At those institutions where the inmate religious community agrees to purchase optional food items, inmates who do not have funds may attend any services associated with the holy day.  (Id. at ¶ 30.)  Muslims are not required to celebrate with a feast meal.  Therefore, the fact that indigent inmates are served regular feast menu items and eat with the general inmate population, and do not gather with the inmates who eat the optional food items which their religious community has elected to purchase, is of no consequence.  There is no religious group activity or prayers at the feast.  (Id. at ¶¶ 31- 33.)  There is simply nothing to lead this Court to conclude that Banks's ability to practice his faith was restricted or that he was

prohibited from practicing his religion in any manner.

As such, the Court need not reach the issues of the impact of accommodation or the absence of ready alternatives.[4]  Therefore, defendants are entitled to an entry of summary judgment on this claim.

<em>b.    Prayer Oils</em>

Defendants argue that Banks's sincerely held religious beliefs were not substantially burdened by the banning of prayer oil because their use is not a mandatory component of his religion.  (Doc. 102, at 23.)  They further argue that "the policy banning the prayer oils has a secular purpose:  deterring theft and subsequent criminal activities by inmates."  (Doc. 130, at 10.)  Banks argues that the veracity of the stated purpose of the policy is undermined by the DOC's commissary stock lists from July 10, 2009 and June 14, 2012, which indicate that during the period of the total ban on religious prayer oils, prisoners [we]re allowed to purchase in abundance quantities items with similar properties to the prayer oils, including 'hair care pink oil moisturizer, skin care Mennens Speed Stick Scent Deodorant, skin care cocoa butter lotion and skin care petroleum jelly."  (Doc. 127, at 81-82; Doc. 129-75 at 1-5.)

The use of incense and prayer oils in Islamic religious ceremonies has been prohibited at SCI-Retreat for approximately ten years.  (Doc. 103, ¶ 61; Doc. 128, ¶ 61; Doc. 129-67, at 2.)  The oils were banned because they would be stolen by other inmates and then sold to

---

[4]Based on this finding, the Court will not address Banks's suggested alternative means of accommodation which included use of the I.G.W.F. fund for indigent inmates and a proposal that non-indigent inmates be allowed to purchase optional menu items for indigent inmates.

other inmates, used to manipulate other inmates, or used to mask the scent of other contraband. (Doc. 103, ¶¶ 63-65.) The decision to discontinue the prayer oils was necessary in order to deter the thefts and subsequent activities of the inmates who stole the oil. (<u>Id.</u> at ¶ 67.) Banks's argument that the stated purpose of the policy is a farce because items with similar properties are sold in the commissary, carries no weight. The record does not contain evidence detailing the "properties" of the banned prayer oils or the "properties" of any of the items sold in the commissary. All indications are that the policy has a valid rational connection to a legitimate penological concern. Specifically, the decision to ban prayer oils was not religious based but, rather was security driven in that it was made in response to inmate thefts.

In considering the second factor, whether there are alternative means, while Islam recommends that Muslim men use a scented oil or perfume before Eid prayers, particularly before Friday Jumu'ah prayer (Doc. 103, ¶ 59), as is evident from various religious pamphlets and book excerpts submitted by Banks, the use of scented oil or perfume is a recommended practice of Prophet Muhammad; it is entirely optional and it is not mandatory. (Doc. 103 at ¶ 60; Doc. 129-24, at 2; Doc. 129-25, at 2; Doc. 129-26.) The record is devoid of any evidence that Banks's ability to practice his faith was restricted or that he was prohibited from practicing his religion in any manner. Because the findings on the first and second findings are dispositive, the court need not reach the third and fourth factors. Defendants are entitled to an entry of summary judgment on this claim.

**C.    Equal Protection**

The Equal Protection Clause guarantees all citizens "equal protection of the laws," meaning that similarly situated people must be treated the same. U.S. Const. amend. XIV. Generally, prison officials cannot discriminate against inmates of different religions. Cruz v. Beto, 405 U.S. 319 (1972) (per curiam). When an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is " 'reasonably related to legitimate penological interests.' " DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000).

Banks first argues "that defendants provided 'special' and 'extra' feast trays that are made available mainly for the purpose of indigent or non-indigent christian/catholic inmates at no cost on their major religious holidays of Christmas, Easter and Thanksgiving for their 'special religious menu', but they denied and deprived indigent Muslim plaintiff of his rewards and blessing from his Lord (*e.g.*, Allah) that he would receive if defendants would have allow[ed] him to participate in the two major religious celebrations feasts (*e.g.* optional menu items/Halal products) at no cost in accordance with Sunnah and Islamic practices." (Doc. 127-1, at 14.)

Banks's has failed to provide any competent summary judgment evidence that Muslims are treated differently than similarly situated faiths. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (stating that the Equal Protection clause does not require that all persons be treated alike, but rather that "all persons similarly situated should be treated alike.") As discussed in the context of the First Amendment, the policy concerning the purchase of optional menu items on religious feast days is applied to all

religions and is reasonably related to legitimate penological interests of cost containment.

Further, despite Banks's contention to the contrary, there is no standard holiday menu for

Easter (Doc. 103, ¶ 48), and Thanksgiving and Christmas are recognized as national

holidays. "Executive Orders and other official announcements of Presidents and of the

Congress have proclaimed both Christmas and Thanksgiving National Holidays in religious

terms. And, by Acts of Congress, it has long been the practice that federal employees are

released from duties on these National Holidays, while being paid from the same public

revenues that provide the compensation of the Chaplains of the Senate and the House and the

military services. See J. Res. 5, 23 Stat. 516 (1885). Thus, it is clear that Government has

long recognized—indeed it has subsidized—holidays with religious significance. Lynch v.

Donnelly, 465 U.S. 668, 676 (1984). Christmas "has very strong secular components and

traditions. Government celebration of the holiday, which is extremely common, generally is

not understood to endorse the religious content of the holiday, just as government celebration

of Thanksgiving is not so understood." Id. at 692. The government may acknowledge

Christmas as a cultural phenomenon, but it may not observe it as a Christian holy day by

suggesting that people praise God for the birth of Jesus." County of Allegheny v. American

Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 601 (1989). The manner of

celebration of Christmas in the 27 Pennsylvania state correctional institutions falls under the

umbrella of a nationally recognized holiday, not religious feast day. Standard Christmas

menus are served at all state correctional institutions to all inmates at no cost to them and

there are no optional menu items available for purchase on this holiday. (Doc. 103, ¶¶ 46-47,

49-50; Doc. 128, ¶ 46.) Banks fails to come forward with evidence that the celebration of Christmas is anything more than an institution-wide holiday meal.

Banks also argues that defendants are treating indigent Muslim inmates differently than Catholic or Christian inmates based on 2009-10 I.G.W.F. Budget expenditures in excess of $4000, identified as "Christmas Expense," "PA State Holiday Kit, Standard," and "PA State Holiday Kit, diabetic" (Doc. 128, ¶ 33; Docs. 129-54, 129-55). He specifically takes issue with the fact that utilizing funds from I.G.W.F. ensures that all Catholics or Christians, whether indigent or not, are provided a Christmas celebration, but that the DOC refuses to fund the Eid feast meals with funds from the I.G.W.F. fund. Banks fails to recognize that the DOC Policy 3.1.1., Fiscal Administration, effective January 27, 2009, dictates that funds from the Inmate General Welfare Fund ("I.G.W.F") may only be expended on approved categories of items, none of which are permitted to relate to a specific religious group. (Doc. 103, ¶ 34 citing DOC Policy 3.1.1(IV)(K)(8); Doc. 101-2.) Because the Christmas celebration within all Pennsylvania state institutions is based on a nationally recognized holiday, not a religious feast, and all inmates benefit equally from the celebration, the use of funds from the I.G.W.F. fund would be permissible under the DOC policy governing distribution of monies from the fund.

Banks also contends that the policy that treats indigent and non-indigent Muslims differently violates his equal protection rights. This argument fails for the basic reason that Banks does not allege that there was discrimination against inmates of different religions. Further indigent prisoners are not entitled to any heightened protection under the equal

25

protection clause. See Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2001) (discussing 28 U.S.C. § 1915(g) in the context of the Fifth Amendment and concluding that indigent prisoners are not a suspect class) (citing Pryor v. Brennan, 914 F.2d 921, 923 (7th Cir.1990) (noting that prisoners do not constitute a suspect class); Harris v. McRae, 448 U.S. 297, 323 (1980) (noting that poverty is not a suspect classification).

Banks fares no better with respect to his claim that the ban of prayer oils violates his equal protection rights as discussed at length supra, the policy banning the oils is reasonably related to legitimate penological security concerns. Nor does he submit any competent evidence that RARs submitted by inmates of varying faiths are treated differently.

**IV.    Conclusion**

Based on the foregoing, defendants' motion for summary judgment will be granted and judgment will be entered in favor of defendants and against plaintiff.

An appropriate order follows.

**BY THE COURT:**

**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

Dated: September 30, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD BANKS,** | : | **CIVIL NO. 3:CV-10-1480** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **SUPERINTENDENT JEFFREY A.** | : | |
| **BEARD, et al.,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

AND NOW, to wit, this 30th day of September 2013, upon consideration of

defendants' motion for summary judgment (Doc. 85), and in accordance with the foregoing

memorandum, is hereby ORDERED that:

1.  Defendants' motion for summary judgment (Doc. 85) is GRANTED and the Clerk of Court is directed to ENTER judgment in favor of defendants and against plaintiff.

2.  Plaintiff's motion to exceed the page limitation *nunc pro tunc* (Doc. 126), is GRANTED.

3.  The Clerk of Court is directed to CLOSE this case.

4.  Any appeal from this order is DEEMED frivolous and not in good faith. See 28 U.S.C. § 1915(a)(3).

BY THE COURT:


s/James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**